Argued and submitted August 18, 2015, affirmed December 7, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN WILLIAM BURK,
*Defendant-Appellant.*

Polk County Circuit Court
13P3140; A155683

386 P3d 148

Stephanie J. Hortsch, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Dustin E. Buehler, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Flynn, Judge.*

* Hadlock, C. J., *vice* Nakamoto, J. pro tempore; Flynn, J., *vice* De Muniz, S. J.

## SERCOMBE, P. J.

Defendant appeals a judgment of conviction for hindering prosecution, ORS 162.325. Defendant was indicted under ORS 162.325(1)(a) for "harbor[ing] or conceal[ing]" his son, who had escaped from an Oregon Youth Authority (OYA) facility. The trial court instructed the jury that it could find defendant guilty of hindering prosecution if defendant did any of the acts described in ORS 162.325(1)(a) to (f).[1] In his sole assignment of error, defendant asserts that the trial court erred in instructing the jury in a manner that allowed the jury to convict defendant based on charges not pleaded in the indictment, in violation of Article VII (Amended), section 5, of the Oregon Constitution.[2] The state responds that, even if the trial court erred, any error was harmless.[3] We conclude that the trial court erred in instructing the jury, but that the error was harmless. Therefore, we affirm.

---

[1] ORS 162.325(1) provides:

"(1) A person commits the crime of hindering prosecution if, with intent to hinder the apprehension, prosecution, conviction or punishment of a person who has committed a crime punishable as a felony, or with the intent to assist a person who has committed a crime punishable as a felony in profiting or benefiting from the commission of the crime, the person:

"(a) Harbors or conceals such person; or

"(b) Warns such person of impending discovery or apprehension; or

"(c) Provides or aids in providing such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension; or

"(d) Prevents or obstructs, by means of force, intimidation or deception, anyone from performing an act which might aid in the discovery or apprehension of such person; or

"(e) Suppresses by any act of concealment, alteration or destruction physical evidence which might aid in the discovery or apprehension of such person; or

"(f) Aids such person in securing or protecting the proceeds of the crime."

[2] Article VII (Amended), section 5, provides, in part:

"(3) *** [A] person shall be charged in a circuit court with the commission of any crime punishable as a felony only on indictment by a grand jury."

That provision has been interpreted to provide criminal defendants with the "'constitutional right to be tried only for the specific criminal act as to which the grand jury handed down the indictment.'" *State v. Guckert*, 260 Or App 50, 57 n 2, 316 P3d 373 (2013), *rev den*, 354 Or 840 (2014) (quoting *State v. Long*, 320 Or 361, 370 n 13, 885 P2d 696 (1994), *cert den*, 514 US 1087 (1995)).

[3] The state also contends that defendant either failed to preserve his claim of error or invited any error. We reject those arguments without further discussion.

Defendant's son, T, was adjudicated delinquent for offenses that, if committed by an adult, would have constituted felonies, and was committed to the custody of the OYA. In the spring of 2012, T ran away from his placement at an OYA facility in Klamath County. OYA obtained a warrant for T's arrest, and Lemhouse, T's juvenile probation officer, communicated with defendant by email and encouraged him to inform OYA immediately if defendant had any contact with T so that OYA could "pick [T] up."

In response, defendant contacted Lemhouse's supervisor, demanding to know why OYA had "ma[d]e" T run and whether they were looking for him. Defendant also contacted an OYA financial specialist and requested that the state reimburse him for T's Supplemental Security Income (SSI), which was being diverted to the state to provide for T's support while T was in OYA custody. Defendant argued that the money should be returned to his family because T was "on the run" and not in the state's care.

In June 2012, police responded to a fight between defendant and T at defendant's residence. Dallas Police Officer Hatchell, who was aware that there was a warrant for T's arrest, attempted to apprehend him, but T escaped by running out through the back door of the house. Officers searched for T, but they could not find him. Sometime after the incident, defendant contacted OYA and asked for the return of SSI funds to repair damage that T had done to the house during the fight.

In December 2012, the OYA financial specialist sent defendant a "final letter" informing him that T's SSI funds would not be returned to defendant. The next evening, defendant emailed Lemhouse, stating, "He's here. Come and get him." When Lemhouse saw the email the next morning, she contacted the Dallas Police Department.

After learning of T's whereabouts from Lemhouse, Dallas Police Officer Collingham went to defendant's house to arrest T. Defendant answered the door and allowed Collingham to enter the house. Defendant told Collingham that T was sleeping in T's bedroom and pointed him towards it. Collingham entered the bedroom, but he did not find T there. Instead, Collingham discovered T hiding in a

closet in his parent's bedroom, which was connected to T's room through a bathroom, and he took him into custody. Collingham did not ask defendant how long T had been staying at defendant's house. Shortly thereafter, defendant emailed OYA, again requesting the return of SSI funds "from [the] time [T] ran. We were taking care of him."

Defendant was subsequently indicted for hindering prosecution and second-degree custodial interference. In the indictment, the state accused defendant of hindering T's prosecution as follows:

"The defendant, on or between March 8, 2012 and December 8, 2012, in Polk County, Oregon, did unlawfully and with the intent to hinder the apprehension and punishment of [T], a person who had committed a crime punishable as [a] felony * * *, harbor or conceal [T], contrary to statute and against the peace and dignity of the State of Oregon."

Defendant proceeded to a jury trial. At trial, the state presented testimony as to the facts presented above from Lemhouse, Hatchell, and Collingham. In addition, Lemhouse testified that T had said that he stayed at defendant's house for the entire time he had been away from OYA.

Defendant and his wife, Tracy, testified for the defense. According to Tracy, T did not live at their house while he was running from OYA, but instead had only "st[u]ck his head in" occasionally, for about three to five minutes, to let them know he was okay. She also testified that he would sometimes call from a blocked number to check in. She further stated that both she and defendant had encouraged T to turn himself in. She also explained that they had only allowed T to stay at the house for one night, the night before he was arrested, and that was "kind of a ruse * * * so that he wouldn't bolt." Finally, she described a Facebook post by one of defendant's friends, claiming that defendant had been staying with him, but she also said that the post had been deleted.

Defendant's testimony was largely consistent with that of his wife, although he explained that he had not been home when T had stopped by, other than the time that he and T fought and T had damaged the house. He also stated that, whenever T would contact them, he would encourage

T to turn himself in. Defendant asserted that he and Tracy had allowed T to stay at the house only on the night before he contacted Lemhouse. He explained that they let him stay to give T a last chance to turn himself in and to make him feel safe so that he would not run. Additionally, defendant said that he had wanted T to go into OYA custody so that he could get the help he needed, and he had cooperated fully when T was in the program. Defendant claimed that he had tried to secure reimbursement for T's SSI because he was angry with OYA for allowing T to run away, and because T had damaged his house. Finally, he testified that he wrote that he had been "taking care of" T, because he was frustrated that he had "gotten the run-around" from the state, and because he was trying to find a way to get money to cover the damage that T had done to the house during their fight.

The parties presented their closing arguments. The state asserted that, to find that defendant had harbored or concealed T, the jury would not have to conclude that he had done so "every single day" that T was a fugitive from OYA. Further, the state argued that the jury should conclude that defendant's email stating that he had been "taking care of" T meant "exactly what it sa[id]," that T had stayed in defendant's home while he was a fugitive. Additionally, the state encouraged the jury to focus on the timing of defendant's email to Lemhouse, informing her of T's whereabouts—the day after the letter rejecting his request for T's SSI was sent—and conclude that defendant had decided to turn in T only after it became clear that he would not receive the money.

In his closing, defendant urged the jury to believe the testimony from defendant and his wife that they did not harbor or conceal T. He further argued that defendant's actions, including cooperating with OYA when T entered the program, encouraging T to turn himself in, and finally informing Lemhouse of T's whereabouts, were not consistent with harboring or concealing T.

Following the attorneys' arguments, the trial court instructed the jury. With respect to the hindering prosecution charge, the court initially described the charge as it

appeared in the indictment, telling the jurors that defendant had been charged with hindering prosecution for "harbor[ing] or conceal[ing]" T. However, when describing the elements of the charge, the court provided the jury with the entirety of Uniform Criminal Jury Instruction 1228, including the five subsections in ORS 162.325(1) not included in the indictment. The court then stated that to "establish the crime of hindering prosecution" the state must prove beyond a reasonable doubt, in relevant part, the following:

> "[Defendant] harbored or concealed such person; warned such person of impending discovery or apprehension; provided—provided or aided in providing such person with money, transportation, weapon, disguise, or other means of avoiding discovery or apprehension.

> "And these are all A, B, and C.

> "D. Prevented or obstructed by means of force, intimidation, or deception anyone performing an act that might aid in discovery or apprehension of such person.

> "E. Suppressed by any act of concealment, alteration, or destruction physical evidence that might aid in the discovery or apprehension of such person.

> "Or F. Aided such person in securing or protecting proceeds of a crime."

The jury subsequently returned a verdict finding defendant guilty of hindering prosecution and not guilty of custodial interference. The trial court entered a judgment of conviction to that effect. This appeal followed.

On appeal, defendant argues that, by instructing the jury on subsections of ORS 162.325(1) other than ORS 162.325(1)(a)—"harbors or conceals"—the trial court substantively amended the indictment and allowed for defendant to be convicted of a crime other than the one for which he was indicted. When addressing variances between an indictment and the trial court's jury instructions, we determine whether the jury instruction, in effect, impermissibly "amended the indictment." *State v. Alben*, 139 Or App 236, 440-41, 991 P2d 1239, *rev den*, 323 Or 153 (1996). "Such an amendment is permissible if it merely changes the form of the indictment; it will, however, violate Article VII (Amended),

section 5, of the Oregon Constitution if it changes the substance of the indictment." *State v. Guckert*, 260 Or App 50, 57, 316 P3d 373 (2013), *rev den*, 354 Or 840 (2014) (citing *State v. Wimber*, 315 Or 103, 113, 843 P2d 424 (1992), and *State v. Long*, 320 Or 361, 370 n 13, 855 P2d 696 (1994), *cert den*, 514 US 1087 (1995) (footnote omitted)).

In *Wimber*, 315 Or at 114-15, the Supreme Court set out four questions that are relevant to determine whether an amendment is a matter of form or substance.

"(1)   Did the amendment alter the essential nature of the indictment against defendant, alter the availability to him of defenses or evidence, or add a theory, element, or crime? * * *.

"(2)   Did the amendment prejudice defendant's right to notice of the charges against him and to protection against double jeopardy? * * *.

"(3)   Was the amendment itself sufficiently definite and certain? * * *.

"* * * * *

"(4)   Did the remaining allegations in the indictment state the essential elements of the offenses?"

Defendant argues, under *Wimber*'s first question, that the jury instruction substantively amended the indictment because it "added five additional theories that were not alleged in the indictment." We agree. The court's instructions informed the jury that it could find defendant guilty if his conduct violated any subsection of ORS 162.325(1); the indictment alleged only that defendant violated ORS 162.325(1)(a). Our past cases dictate that a trial court errs in issuing a jury instruction that creates a "variance between the specific act charged in the indictment and the more expansive set of acts included in the jury instruction * * *." *Guckert*, 260 Or App at 54, 59-60 (concluding trial court violated Article VII (Amended), section 5, by instructing the jury that defendant could be convicted of sexual abuse for touching "a sexual or intimate part" of the victim, where defendant was indicted only for touching the victim's vagina); *see also State v. Warren*, 280 Or App 164, 166, 380 P3d 1191 (2016) ("The jury instructions in this case told the

jury that it could convict defendant of hindering prosecution if it found that she had prevented or obstructed anyone from performing an act that might aid in the discovery or apprehension of a person who has committed a felony. The problem with that instruction is that the indictment alleged only that defendant had committed the crime by concealing the man in her home."); *State v. Pierce*, 235 Or App 372, 376, 232 P3d 976 (2010) (concluding that the trial court violated Article VII (Amended), section 5, by instructing the jury that defendant could be convicted of unlawful use of a vehicle by "taking, operating, exercising control over, riding in or by otherwise using the vehicle," where the defendant had been indicted only for "taking" the vehicle); *Alben*, 139 Or App at 242-43 (concluding that the trial court violated Article VII (Amended), section 5, by instructing the jury that the defendant could be convicted of unlawful use of a weapon for using a "deadly weapon" or a "dangerous weapon," where the defendant was indicted only for using a "deadly weapon"). Because the hindering prosecution instruction expanded the scope of liability to a set of acts beyond the specific act charged in the indictment, it violated Article VII (Amended), section 5.

The conclusion that the trial court erroneously instructed the jury does not end the inquiry. Rather, "[i]nstructional error, like any other error, does not justify reversal unless the error was prejudicial. Under Article VII (Amended), section 3, of the Oregon Constitution, we must affirm despite error if there is 'little likelihood that the particular error affected the verdict[.]'" *Guckert*, 260 Or App at 60 (quoting *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (brackets in *Guckert*)). We conclude that there was little likelihood that the error in this case affected the verdict.

The record in this case lacks evidence from which a jury could have found defendant guilty of hindering prosecution other than by harboring or concealing T. Defendant offers two alternative theories that he contends are supported by the evidence and could have led to an improper conviction. First, defendant asserts that the jury could have found him guilty under ORS 162.325(1)(b), which provides that a defendant commits the crime of hindering prosecution if he or she "[w]arns [a fugitive] of impending discovery

or apprehension[.]" Defendant claims that a jury could have inferred that defendant had warned T that the police were coming, because T was found hiding in the closet. The record, however, does not support that inference. Not only did defendant email Lemhouse to inform her that T was in the house, but the police did not arrive until the day after defendant sent his email. That evidence could not lead a jury to find that defendant had warned T that the police were coming.

Second, defendant asserts that a jury could have found defendant guilty under ORS 162.325(1)(c), which proscribes "[p]rovid[ing] or aid[ing] in providing [a fugitive] with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension[.]" According to defendant, a jury could have found that defendant provided T with money and other items to help him avoid police based on his representation that he had been "taking care of" T and Tracy's testimony that T would briefly drop by the house. Defendant contends that a jury could have inferred that defendant was passing money or other aid to T when T stopped by the house. The record, however, lacks any evidence that defendant passed money or other aid to T when T stopped by defendant's house. Indeed, defendant testified that he was not present for any of T's visits, except the one that ended in a fight between defendant and T. Accordingly, the evidence for defendant's guilt with respect to ORS 162.325(1)(b) and (c) was so speculative that we conclude that there is little likelihood that the jury convicted defendant under one of those provisions, instead of ORS 162.325(1)(a).

Just as importantly, both the prosecutor and defense counsel framed the question for the jury as whether defendant harbored or concealed T. The prosecutor emphasized to the jurors that they should convict defendant because he "harbored" T in his home, and asserted that defendant's email that he had been "taking care of him" indicated just that. For his part, defense counsel also confined his arguments to whether defendant harbored or concealed T. *See Guckert*, 260 Or App at 60 (concluding that the defendant suffered no prejudice due to the overbroad jury instruction based, in part, on the fact that the prosecutor emphasized the charge, as indicted, in the closing argument).

Finally, defendant was not deprived of a defense as an effect of the jury instruction. Defendant did not defend his case by offering evidence that would have allowed for conviction under another subsection of ORS 162.325(1). Instead, defendant denied that he had harbored or concealed his son, admitting to no conduct that would have exposed him to liability under an uncharged, alternative theory. That distinguishes this case from *Pierce* and *Alben*, where "in order to defend against specific charges, the defendants admitted to other conduct that could have been, but was not, charged in the indictments." *Guckert*, 260 Or App at 60. *See Pierce*, 235 Or App at 377 ("Those instructions permitted the jury to convict even if they found—as they could have, based on defendant's testimony that his friends were driving the truck and a police officer's testimony that defendant was riding in the truck with two other people when the officer stopped them—that the state proved that defendant rode in the truck but that the state did not prove beyond a reasonable doubt that defendant took [the victim's] truck."); *Alben*, 139 Or App at 243 ("In response to the state's initial theory of the case, defendant put on evidence that, if believed, would have provided a defense. Although he admitted being in possession of a BB pistol, he denied being in possession of a deadly weapon. The amendment provided the state with a different theory of the case, altered the availability of defendant's defense, and prejudiced defendant's right to notice of the charges against him.").

In sum, we conclude that the trial court erred in issuing an instruction to the jury that added additional theories of guilt beyond the allegations in the indictment, but that the error was harmless.

Affirmed.